# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **WEN HO LEE, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 99-3380 (RMC)** |
| | ) | |
| **DEPARTMENT OF JUSTICE, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION

The Court considers Plaintiff Wen Ho Lee's request to hold Walter Pincus, a Pulitzer Prize–winning reporter for *The Washington Post* and a non-party to this lawsuit, in civil contempt.  In the underlying action, Dr. Lee accuses various federal agencies of violating his rights under the Privacy Act of 1974, 5 U.S.C. § 552a (2000), by "leaking" information about him to the news media in order to cover up their own security failures at Los Alamos National Laboratory.  Mr. Pincus is one of six reporters to whom Dr. Lee issued deposition subpoenas.  On June 29, 2004, this Court granted Dr. Lee's motion to compel further deposition testimony from Mr. Pincus after Mr. Pincus refused to answer questions concerning the identity of his sources.  Although Mr. Pincus appeared for a second deposition, he continued to refuse to answer questions about the identity of his confidential sources, asserting that such information was protected by a "reporter's privilege." Dr. Lee subsequently filed an Application for an Order to Show Cause Why Non-Party Journalist Walter Pincus Should Not Be Held in Civil Contempt ("Pl.'s App."), which this Court granted on January 4, 2005.

After careful consideration of the parties' briefs, oral arguments, and the entire record, this Court finds that the information that Mr. Pincus refuses to disclose is not protected by a reporter's privilege under the First Amendment or the common law.  As there is clear and convincing evidence that Mr. Pincus refused to provide answers to deposition questions concerning the identity of his sources despite this Court's June 29, 2004, Order to do so,  Mr. Pincus will be held in civil contempt.

## I. BACKGROUND

### A. The Investigation

Dr. Wen Ho Lee, a scientist who was employed by the Department of Energy ("DOE"), was investigated by the Federal Bureau of Investigation ("FBI") and the DOE on suspicion of espionage on behalf of the People's Republic of China from 1996 to 1999.  *Lee v. Dep't of Justice*, 413 F.3d 53, 55 (D.C. Cir.), *reh'g en banc denied*, 2005 WL 2874940 (D.C. Cir. Nov. 2, 2005).  The criminal investigation led to Dr. Lee's imprisonment in solitary confinement for nine months in 1999.  Pl.'s App. at 3.  The Government never sought to prosecute Dr. Lee for espionage, however, and in December 1999 Dr. Lee was indicted on 59 counts of mishandling computer files at Los Alamos National Laboratory.  *See Lee*, 413 F.3d at 55.  Subsequently, the Government withdrew 58 counts, Dr. Lee pled guilty to one count of mishandling computer files, and Dr. Lee was sentenced to time served.[1]  *Id.*

---

[1] It cannot go unnoted that the manner in which Dr. Lee was treated by the Government appears to have been particularly egregious.  In open court, Judge James A. Parker of the United States District Court for the District of New Mexico apologized to Dr. Lee, noting that "the top decision makers in the executive branch, especially the Department of Justice and the Department of Energy . . . [] have caused embarrassment by the way this case began and was handled' and 'have embarrassed our entire nation and each of us who is a citizen of it." Pl.'s

The Lee investigation was first reported in *The Wall Street Journal* on January 7, 1999, and then by Mr. Pincus in *The Washington Post* on February 17, 1999. *Id.* On March 6, 1999, *The New York Times* published an article concerning the investigation of a Chinese-American computer scientist at Los Alamos, but the article did not identify Dr. Lee by name. *Id.* However, on March 9, 1999, both *The New York Times* and *The Washington Post*, in another article authored by Mr. Pincus, identified Dr. Lee by name and discussed details of the investigation in reliance on numerous anonymous Government sources. Pl.'s App. at 6. Journalists from *The Los Angeles Times*, the Cable News Network ("CNN"), the Associated Press, and various other media outlets also reported on the Lee investigation, similarly relying on information from anonymous Government sources. *Id.* Once the Government's investigation shifted from charges of espionage to mishandling of computer files, both *The New York Times* and CNN published articles citing anonymous Government sources to support allegations that Dr. Lee had mishandled important computer codes for nuclear weapons by downloading them to an unsecured computer. *Id.* at 7.

## B. The Privacy Act Lawsuit

On December 20, 1999, Dr. Lee brought suit against the United States Department of Justice ("DOJ"), the DOE, and the FBI, alleging that each defendant had improperly disclosed personal information about him and the investigation in violation of the Privacy Act.[2] *Id.* at 4. The

---

App. at 4 (quoting *Statement by Judge in Los Alamos Case, With Apology for Abuse of Power*, N.Y. Times, Sept. 14, 2000, at A25).

[2] The Privacy Act provides, in relevant part, that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," and that "prior to disseminating any record about an individual[,] . . . [the agency must] make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." *Id.* § 552a(b), (e)(6).

heart of Dr. Lee's complaint is that "in connection with their investigations of suspected espionage at Los Alamos National Laboratory and a simultaneous public relations campaign to ameliorate damaging publicity about security lapses, the defendant agencies disclosed information pertaining to [him] by name, without obtaining his consent or assuring its accuracy, to persons not authorized to receive it, namely the news media." *Lee v. Dep't of Justice,* 287 F. Supp. 2d 15, 16-17 (D.D.C. 2003) (Jackson, J.) ("Discovery Order").  Dr. Lee alleges that employees of the defendant agencies illegally leaked information to the press concerning his and his wife's employment histories, their financial transactions, details about their trips to Hong Kong and China, details concerning the Government investigation and interrogation, and purported results from polygraph tests.  *Lee*, 413 F.3d at 56.  He has requested damages in the amount of $1,000 per Privacy Act violation in addition to reasonable attorney's fees and costs.  *Id*.

### C.  Dr. Lee's Discovery Efforts

Dr. Lee's Privacy Act lawsuit was stayed during his criminal case.  On July 31, 2001, this Court entered an order permitting unrestricted discovery.  Dr. Lee made at least 420 written discovery requests to the Government defendants — 295 requests for production, 74 special interrogatories, and 51 requests for admission.  Pl.'s App. at 9.  However, Dr. Lee "was largely rebuffed by assertions of law enforcement privilege and learned nothing identifying the source of the leaks."  *Lee*, 413 F.3d at 56.  In October 2001, Dr. Lee began deposing Government officials whom he identified as likely to have relevant information based on the Government's responses to his written discovery requests.  He deposed six employees from the DOE,[3] six officials from the DOJ[4]

---

[3] The DOE employees deposed were (1) Bill Richardson, former Secretary of Energy; (2) Nora Trulock, Acting Director of DOE Intelligence and Counterintelligence; (3) Edward Curran, former director of the DOE Office of Counterintelligence; (4) Mary Anne Sullivan,

and eight FBI officials.[5]  *Id.*  Despite Dr. Lee's extensive written discovery requests and focused

depositions of Government officials likely to have relevant knowledge, he was unable to obtain

information concerning the source of the leaks.  *Id.*

      In August of 2002, Dr. Lee issued subpoenas to journalists James Risen and Jeff

Gerth of *The New York Times*, Robert Drogin of *The Los Angeles Times*, H. Josef Hebert of the

Associated Press, and Pierre Thomas of CNN seeking testimony and documents concerning the

identity of the leakers.  *Id.*  Each of these journalists filed motions to quash their subpoenas on the

grounds of a reporter's privilege to refuse to reveal confidential news sources.  Discovery Order, 287

F. Supp. 2d at 17.  On October 9, 2003, Judge Thomas Penfield Jackson issued an order denying

each of the five journalists' motions to quash and ordering them to sit for depositions and to

"truthfully answer questions as to the identity of any officer or agent of defendants . . . who provided

---

General Counsel to the DOE; (5) Brooke Anderson, former director of the DOE's Office of
Public Affairs; and (6) Abel Lopez, head of the DOE's Freedom of Information Act and Privacy
Act Division.  Pl.'s App. at 10-11.  The first three employees "in particular had been identified as
likely sources of the leaks, but were unable (or unwilling) to identify the leaker(s)."  *Lee*, 413
F.3d at 56.

    [4] From the DOJ, Dr. Lee deposed (1) Myron Marlin, lead press official at the DOJ during
the relevant time period; (2) John Dion, Acting Chief of the Internal Security Division;
(3) Michael Liebman, part of the prosecution team and author of a memo that asserted that
Secretary Richardson disclosed Dr. Lee's name to the press; (4) Craig Iscoe, employee in the
Deputy Attorney General's office; (5) Robert Gorence, Dr. Lee's chief prosecutor; and (6) John
J. Kelly, the United States Attorney for the District of New Mexico and the attorney in charge of
the criminal case against Dr. Lee.  Pl.'s App. at 11.

    [5] From the FBI, Dr. Lee deposed (1) Louis Freeh, former Director of the FBI; (2) Neil
Gallagher, former Assistance Director, National Security Division; (3) John Collingwood, former
Assistant Director, Office of Public and Congressional Affairs; (4) Michael DeFeo, chief internal
investigator for the FBI; (5) Robert Bucknam, Mr. Freeh's chief of staff; (6) David Kitchen,
Special Agent in charge of the Albuquerque office of the FBI; (7) William Lueckenhoff,
Assistant Special Agent in charge of the Albuquerque office; and (8) Carol Colvert, lead FBI
Special Agent on Dr. Lee's case.  Pl.'s App. at 11-12.

information to them directly about Wen Ho Lee, and as to the nature of the information so provided." *Id.* at 25.

In rejecting the journalists' assertions of privilege, the Court relied on the D.C. Circuit's decision in *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981), which "laid out guidelines for balancing First Amendment interests with a litigant's need for information when a plaintiff seeks to subpoena a non-party journalist in the context of a civil action." *Lee,* 413 F.3d at 56-57. *Zerilli* recognized "a limited privilege upon which a reporter might withhold testimony on First Amendment grounds if it would compromise a confidential news source." Discovery Order, 287 F. Supp. 2d at 18. However, a plaintiff can overcome this qualified privilege and compel a journalist to reveal the identity of his or her confidential sources if (1) the information sought goes "to the heart of" the plaintiff's case and (2) the plaintiff has exhausted "every reasonable alternative source of information" before seeking testimony from the journalist(s). *Zerilli*, 656 F.2d at 713; *cf. Lee v. Dep't of Justice*, No. 04-5301, 2005 WL 2874940, at *2-3 (D.C. Cir. Nov. 2, 2005) (Tatel and Garland, JJ., dissenting from the denial of rehearing en banc) (arguing for a different interpretation of *Zerilli*) ("*Lee (Denial of Rehearing)*"). Judge Jackson determined that Dr. Lee had clearly met both *Zerilli* requirements to overcome the journalists' qualified privilege, and that at this stage in the litigation "only [the journalists] can testify as to whether defendants were the sources for the various news stories." Discovery Order, 287 F. Supp. 2d at 22.

Despite Judge Jackson's order, the journalists continued to assert a reporter's privilege and refused to answer any questions concerning the identities of their sources when they appeared for their second depositions in December 2003 and January 2004. Accordingly, on February 13, 2004, Dr. Lee filed an application for an order to show cause why the journalists should

not be held in civil contempt of the Discovery Order.  Judge Jackson issued an order granting Dr.

Lee's application on June 29, 2004, and a show cause hearing was held on August 18, 2004.  That

same day, Judge Jackson issued a twelve-page memorandum opinion and order holding each of the

journalists in civil contempt for their failures to comply with the Discovery Order.  *See Lee v. Dep't

of Justice*, 327 F. Supp. 2d 26, 27-28 (D.D.C. 2004) (Jackson, J.) ("Contempt Order").[6]  The

journalists appealed Judge Jackson's Discovery and Contempt Orders and the Court of Appeals

upheld them in *Lee v. Department of Justice*, 413 F.3d 53 (D.C. Cir. 2005).[7]

### D.  Dr. Lee's Efforts to Seek Testimony from Mr. Pincus

Mr. Pincus authored at least four articles concerning the Government's investigation

of Dr. Lee.[8]  Response of Walter Pincus to the Order to Show Cause ("Pincus Response") at 8-10.

In late 2002, Dr. Lee served a deposition subpoena on Mr. Pincus, that, like the subpoenas issued

------

[6]  Having found all of the journalists in contempt, the court imposed a fine of $500 per day per journalist, and stayed the fine pending a timely appeal.

[7]  The Court affirmed Judge Jackson's Contempt Order as to four of the five journalists, finding that there was "too much ambiguity in the record to uphold a finding of contempt" as to the fifth journalist.  *Lee*, 413 F.3d at 64.  The four journalists whose findings of contempt were upheld (James Risen, H. Josef Hebert, Bob Drogin, and Pierre Thomas) filed a Petition for Panel Rehearing and/or Rehearing En Banc, which was denied on November 2, 2003.  *Lee (Denial of Rehearing)*, 2005 WL 2874940, at *1 (D.C. Cir. Nov. 2, 2005).

[8]  An article dated February 17, 1999, titled *U.S. Cracking Down on Chinese Nuclear Designs on Nuclear Data*, disclosed that the FBI investigation had "c[o]me to focus on an Asian American scientist at Los Alamos who had contacts with the Chinese and has since been transferred to a job outside the national security area," but did not identify Dr. Lee by name.  Pincus Response at 8 (quoting article).  On March 9, 1999, Mr. Pincus authored an article, titled *Spy Suspect Fired at Los Alamos Lab*, which identified Dr. Lee as the "weapons designer . . . who was under suspicion of handing nuclear secrets to China."  *Id.* at 9 (quoting article).  On November 20, 1999, an article titled *Fired Lab Scientist Can't Account for Some Disks*, was published in *The Washington Post* under the joint byline of Mr. Pincus and another journalist, Vernon Loeb.  Finally, Mr. Pincus authored an article on February 4, 2001, titled *Interrogation of Lee Raises New Questions, Sources Say*.  *Id.* at 10.

to the other journalists, requested testimony and documents concerning the source or sources of the Government defendants' leaks.  Unlike the other journalists, Mr. Pincus did not move to quash his deposition subpoena.  Accordingly, he was not among the journalists covered by Judge Jackson's October 9, 2003, Discovery Order.[9]

Mr. Pincus appeared for his first deposition on January 29, 2004.  As had the other journalists, Mr. Pincus refused to answer any questions concerning the identity of the individual(s) who provided information to him about Dr. Lee, invoking the "reporter's privilege" 117 times.  Pl.'s App. at 17.  Accordingly, on February 13, 2004, when Dr. Lee filed an application for an order to show cause why the other journalists should not be held in civil contempt, he simultaneously filed a motion to compel further deposition testimony from Mr. Pincus.  *Id.*  Judge Jackson's June 29, 2004, Order, which ordered the other journalists to show cause why they should not be held in contempt, granted Dr. Lee's motion to compel further deposition testimony from Mr. Pincus "essentially for the reasons stated in the Court's October 9, 2003, Memorandum & Order."  *Lee v. Dep't of Justice*, Civil Action No. 99-3380 (TPJ), at 1 (D.D.C. June 29, 2004) [Dkt. No. 134].[10]

---

[9] Dr. Lee asserts that "Mr. Pincus was not included in the October 2003 Order because, pursuant to an agreement between counsel, he did not move to quash his deposition subpoena but agreed to be bound by the Court's ruling as to the other journalists."  Pl.'s App. at 14 n.2, 17; *see also* Plaintiff Wen Ho Lee's Reply to Non-Party Journalist Walter Pincus's Response to the Order to Show Cause ("Pl.'s Reply") at 1-2.  Mr. Pincus contends that his counsel agreed that, if the other reporters' motions to quash were denied, Mr. Pincus would not file a motion to quash, but he would still assert a reporter's privilege at his deposition.  *See* Opposition of Walter Pincus To Plaintiff Wen Ho Lee's Proposed Opinion ("Pincus Opp.") at 3.  The Court need not resolve which account is accurate.  The point is that Mr. Pincus did not proceed along the same procedural track as the other five journalists because of a supposed agreement and not because his particular situation is factually distinguishable.

[10] After the Court granted Dr. Lee's motion to compel, Mr. Pincus agreed to stipulate to the Court that he would not reduce or change his assertions of privilege if he were to sit for a second deposition.  Pl.'s Reply at 2.  Judge Jackson rejected the proposed stipulation on August

Mr. Pincus's second deposition was subsequently scheduled for August 30, 2004. For that reason, he was not included in the contempt hearing concerning the other journalists on August 18, 2005, and Judge Jackson's Contempt Order did not apply to him.  *See* Contempt Order, 327 F. Supp. 2d at 28 n.1 ("Walter Pincus of *The Washington Post* (who became subject to the October 9th Order as of June 29, 2004) is not presently before the Court, having yet to be deposed in accordance with the October 9th Order.").

When Mr. Pincus appeared for his second deposition on August 30, 2004, he again refused to answer questions concerning the identity of the sources who directly provided information to him about Dr. Lee and the Lee investigation.   Again, he invoked the "reporter's privilege" approximately 100 times.  *See* Pl.'s App. at Exh. 24 (Depo. Tr. of W. Pincus).

On December 17, 2004, Dr. Lee filed an Application for an Order to Show Cause why Mr. Pincus should not be held in civil contempt.[11]

## II.  LEGAL STANDARDS

This Court has both an "inherent and a statutory power to enforce compliance with its orders through the remedy of civil contempt."  *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 16 (D.D.C. 2000) (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966)).  A person is in contempt of court when he "violates a specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order."  *SEC v. Bankers Alliance Corp.*, 881 F. Supp.

---

5, 2004, and ordered Mr. Pincus to testify at a second deposition as soon as possible.  *Id*.

[11] Judge Jackson retired on August 30, 2004, the day of Mr. Pincus's second deposition. This case was reassigned to the undersigned on October 7, 2004.  On November 18, 2004, this Court held a status conference and directed Dr. Lee to file his Application for an Order to Show Cause.

673, 678 (D.D.C. 1995) (citation omitted); *see also NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173,

1184 (D.C. Cir. 1981).  The contemnor's intent is immaterial; the Court need not determine whether

a failure to comply with its order was either willful or intentional.  *Blevins Popcorn Co.*, 659 F.2d

at 1184; *see also Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007,

1016-17 (D.C. Cir. 1997).  The party seeking a finding of contempt has the burden of demonstrating,

by clear and convincing evidence, that: (1) the Court's order was reasonably clear and specific; and

(2) the alleged contemnor failed to comply with the Court's order.  *See Bankers Alliance Corp.*, 881

F. Supp. at 678; *Washington-Baltimore Newspaper Guild, Local 35 v. Washington Post Co.*, 626

F.2d 1029, 1031 (D.C. Cir. 1980).

### III.  ANALYSIS

The question before the Court is whether, in the circumstances of this case, Mr.

Pincus can rely on a reporter's privilege under the First Amendment or common law to refuse to

answer deposition questions concerning his sources for stories he authored or co-authored about Dr.

Lee.  Mr. Pincus argues that there is no cause for holding him in contempt of court for protecting the

identities of his confidential sources "because the underlying Order directing him to reveal them is

unsustainable."  Pincus Response at 1.  Mr. Pincus contends that he is protected by a qualified First

Amendment privilege and that Dr. Lee has not met his burden under *Zerilli v. Smith* to overcome that

privilege.  Mr. Pincus also argues that this Court should recognize a federal common law privilege

that protects reporters from disclosing their sources when the public interest in newsgathering

outweighs the public interest in compelling disclosure.  For the reasons stated below, the Court

rejects Mr. Pincus's assertion of both privileges and finds that there is clear and convincing evidence

that he failed to comply with the Court's June 29, 2004, Order by refusing to answer questions

10

concerning the identities of the Government sources who provided him with information about Dr. Lee and the Lee investigation.

## A.  The Qualified First Amendment Privilege[12]

The Supreme Court first considered the possibility of a reporter's privilege rooted in the First Amendment in *Branzburg v. Hayes*, 408 U.S. 665 (1972). *Branzburg* concerned the refusal of several reporters to reveal the identities of confidential sources to a grand jury. The reporters asserted a First Amendment privilege in order to protect journalists' newsgathering ability, especially when information was given in confidence. *See id.* at 668-71. The Court flatly rejected any such reporters' privilege to shield the identity of sources from the grand jury, noting that "the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination." *Id.* at 689-90. The Court then refused "to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy." *Id.* at 690.

However, several courts, including the D.C. Circuit, have limited the applicability of *Branzburg* to criminal proceedings. *Zerilli*, 656 F.2d at 705 ("Although *Branzburg* may limit the scope of a reporter's First Amendment privilege in criminal proceedings, this circuit has previously held that in civil cases, where the public interest in effective law enforcement is absent, that case is not controlling.").[13]  Accordingly, this Circuit has held that while there is "no *absolute* First

---

[12]  The Court of Appeals in *Lee*, 413 F.3d 53, has already determined that Dr. Lee exhausted his alternatives and that the information he seeks from the other journalists is central to his Privacy Act suit. The Court provides a person-specific analysis of the First Amendment issues as they relate to Mr. Pincus because he argues that his situation is distinguishable.

[13]  *See also In re Grand Jury Proceedings*, 5 F.3d 397, 403 (9th Cir 1993); *Riley v. City of Chester*, 612 F.2d 708, 714 (3d Cir.1979); *Baker v. F and F Inv.*, 470 F.2d 778, 784-85 (2d Cir.

Amendment barrier to the compelled disclosure by a newsman of his confidential sources," *Carey v. Hume*, 492 F.2d 631, 639 (D.C. Cir. 1974) (emphasis added), there is a *qualified* reporter's privilege in civil actions.  *See Lee*, 413 F.3d at 58 ("*Zerilli*, like *Carey*, made it plain that any such privilege is qualified, not absolute.").  "[I]n the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege." *Zerilli*, 656 F.2d at 712.

Like Dr. Lee, the plaintiffs in *Zerilli* sued several federal agencies under the Privacy Act, alleging that transcripts of their recorded conversations had been leaked to the press. *See id.* at 706.  In an effort to ascertain the source of the leaks, the plaintiffs sought to depose news reporters and the reporters refused to reveal their sources, relying on a reporter's privilege under the First Amendment.  *Id.* at 706-07.  The Court of Appeals sustained invocation of the privilege and articulated a two-part test to determine whether a court may compel a reporter to disclose confidential sources: The information sought must be "of central importance" to the plaintiff's case, *id.* at 713, and the plaintiff must demonstrate that "he has exhausted every reasonable alternative source of information."  *Id.*  If both of these requirements are met, the plaintiff's need for the testimony overcomes the reporter's qualified privilege.  *Id.* at 713-714.

*Zerilli* and *Lee* set the standard in this Circuit for determining when a reporter's First Amendment privilege must yield to a plaintiff's need for information: The reporter must answer questions for information (1) that is "central" to a plaintiff's case and (2) as to which the plaintiff has exercised all reasonable alternatives to obtain elsewhere.  Use of this two-part analysis defines

---

1972).

12

whether "extraordinary circumstances" exist.[14]   Mr. Pincus contends that this First Amendment privilege is "designed to prevail in all but the most extraordinary circumstances," Pincus Response at 17, and that Dr. Lee has not met his heavy burden under *Zerilli* to overcome it.   More specifically, he argues that the identities of his confidential sources are not central to Dr. Lee's lawsuit and that Dr. Lee has failed to exhaust all reasonable alternative sources of the information that he claims to need.   *Id*. at 1; Opposition of Walter Pincus to Plaintiff Wen Ho Lee's Proposed Opinion ("Pincus Opp.") at 16-17.   The Court addresses each argument in turn.

### 1.  Centrality

According to Mr. Pincus, the information sought from him by Dr. Lee is not crucial to Dr. Lee's Privacy Act case because (1) Dr. Lee failed to mention two of Mr. Pincus's relevant articles in his Second Amended Complaint; (2) Dr. Lee's name and other details of the Lee investigation were broadcast to the public prior to the publication of Mr. Pincus's March 9, 1999, article identifying Dr. Lee by name; and (3) the information in Mr. Pincus's February 4, 2001, article was disclosed to him by governmental *and* non-governmental sources so Dr. Lee cannot demonstrate that the disclosure that allegedly caused him harm was from a governmental source (as required by the Privacy Act).   Pincus Response at 24-28.   These arguments do not prevail.

First, the fact that Dr. Lee did not specifically mention Mr. Pincus's February 1999 and November 1999 articles in his Second Amended Complaint is of no moment.   Dr. Lee has

---

[14] The law in this Circuit requires no more.   When the first group of reporters sought rehearing *en banc* before the Court of Appeals to reconsider its application of *Zerilli* in *Lee*, the Circuit split its vote with no majority voting to rehear the case.   Two of the four dissenting judges wrote detailed opinions, suggesting that *Zerilli* properly requires a third prong to the First Amendment analysis in Privacy Act cases to balance the public benefits and private harms of forced disclosure.   That position failed to garner majority support (and perhaps not the support of all four dissenters).

continually asserted that Mr. Pincus is one of the reporters who likely has information concerning the identities of the Government officials who allegedly leaked information to the press. Furthermore, the two Pincus articles that Dr. Lee does reference in the Second Amended Complaint demonstrate that Mr. Pincus can testify to the identity of one or more Government leakers. *See* Walter Pincus, *Spy Suspect Fired at Los Alamos Lab*, Wash. Post, Mar. 9, 1999, at A1 (identifying Dr. Lee as the Los Alamos weapons designer who was under suspicion for handing nuclear secrets to China); Walter Pincus, *Interrogation of Lee Raises New Questions, Sources Say*, Wash. Post, Feb. 4, 2001, at A2 (reporting that during the Government's investigation of Dr. Lee, his answers raised questions about his relationships with scientists from China and Taiwan).

Second, Mr. Pincus's argument that "there is no evidence of actual injury stemming from *The Post*'s mere repetition of [Dr. Lee's] name" is wholly without merit. The fact that other journalists may have published Dr. Lee's name prior to Mr. Pincus's publication of his name does not shield Mr. Pincus from his obligation to give truthful deposition testimony. There is no basis to assume that each journalist who published an article relating to the Lee investigation received information from the same source(s) and Dr. Lee must know who all of those source(s) were in order to effectively pursue his Privacy Act lawsuit. *See Lee*, 413 F.3d at 60 (noting that "this argument fails both because each [journalist] may have different sources and because such an argument could be used to exclude all journalists' testimony whenever there is a leak to more than one person"). Without obtaining the testimony of each journalist with relevant knowledge, Dr. Lee has no way of knowing how many different Government sources were leaking information to the press in alleged

violation of his Privacy Act rights.[15]

Finally, Mr. Pincus's argument that Dr. Lee cannot demonstrate harm under the Privacy Act because he cannot first demonstrate that disclosures to Mr. Pincus were from a Government source is circular and unpersuasive.  At this time, Dr. Lee does not know who leaked information to the press.  As found by the Court of Appeals, that information is central to Dr. Lee's Privacy Act suit.  Mr. Pincus would have the Court require Dr. Lee to demonstrate that the unknown confidential source is a Government official (as intimated in the articles) before Mr. Pincus could be required to give the source a name.  Discovery is not limited to confirming something that is already known but is also for the purpose of making known what is unknown.  Under *Zerilli* and *Lee*, Dr. Lee must demonstrate that the requested information is both crucial to his case and that he has exhausted all alternatives.  Once he has met those burdens, the qualified privilege enjoyed by Mr. Pincus is overcome and Mr. Pincus must answer all relevant questions concerning his Government

---

[15] Mr. Pincus relies on *Wright v. FBI*, 385 F. Supp. 2d 1038 (C.D. Cal. 2005), for the proposition that a journalist's claim of privilege cannot be overcome when the information disclosed is already in the public domain.  *See* Walter Pincus's Notice of Supplemental Authority at 1.  In *Wright*, a plaintiff was seeking testimony and unpublished notes from a non-party journalist for purposes of a Privacy Act lawsuit, which was premised upon a claim that an FBI agent disclosed information from his personnel records to the non-party journalist without his consent.  *Id*. at 1039.  The court upheld the magistrate judge's determination that the journalist's testimony and notes were not "clearly relevant" or crucial to the plaintiff's case because the *plaintiff himself* had already placed the information in the public domain.  *Id*. at 1042 ("Plaintiff issued press releases, held press conferences, and established a website discussing the information of which he now complains.").  Accordingly, the court determined that the FBI agent's conversation did not amount to a "disclosure" for purposes of the Privacy Act.  *Id*. *Wright* is clearly distinguishable from the case at bar.  Dr. Lee was not responsible for disseminating the information that he claims caused him harm.  The fact that *other journalists* published information that was leaked to them prior to Mr. Pincus's publication of the same information (which could have come from the same or different Government sources) does not make the identities of Mr. Pincus's confidential sources any less relevant or crucial to Dr. Lee's Privacy Act claims.  *See Lee*, 413 F.3d at 60.

15

sources, not just those questions for which Dr. Lee has already tentatively identified a Government source.

To date, none of the defendants has admitted to being the source of the leaked information. "To prevail at trial . . . plaintiff must perforce prove that they were, and that the third parties unconnected with defendants (but coincidentally in possession of the same information) were not the informants." Discovery Order, 287 F. Supp. 2d at 20. Without obtaining truthful testimony from journalists concerning the identities of the Government sources who allegedly leaked information to the press, Dr. Lee cannot proceed with his lawsuit. *Lee*, 413 F.3d at 60 ("If he cannot show the identities of the leakers, Lee's ability to show other elements of his Privacy Act claim . . . will be compromised."). Accordingly, it is axiomatic that this information "goes to the heart" of Dr. Lee's case. *Zerilli*, 656 F.2d at 713 (quoting *Carey*, 492 F.2d at 636). Mr. Pincus is no less important as a potential witness concerning Government leaks than the journalists from other media outlets, and the Court finds no basis to reach a different decision concerning him.

### 2. Exhaustion

According to Mr. Pincus, Dr. Lee has not exhausted "every reasonable alternative source of information" because he has failed "to make any serious and substantial effort" to depose possible witnesses. Pincus Response at 29. The Court of Appeals rejected this argument as it related to the other reporters, noting that "[w]hile Lee did not depose every individual who conceivably could have leaked the information," he clearly met his burden as to exhaustion. *Lee*, 413 F.3d at 61. The same analysis is applicable here.

Dr. Lee deposed twenty Government officials in this case, asking each official whether he or she knew the identities of the individuals who leaked information concerning him and

the Government's investigation to the press.  Judge Jackson determined that Dr. Lee's discovery efforts demonstrated that he "diligently pursu[ed] direct proof that the officers or employees of one or more defendant agencies were the original disseminators of the information about him to the news media."  Discovery Order, 287 F. Supp. 2d at 20.  The defendants' responses revealed "a pattern of denials, vague or evasive answers, and stonewalling," leading Judge Jackson to conclude that "only the journalists can testify as to whether defendants were the sources for the various news stories." *Id*. at 22.  This Court agrees.

Mr. Pincus's argument that Dr. Lee should have deposed every individual suspected of providing information to Mr. Pincus or possessing any information that was allegedly leaked to the press is far beyond the scope of Dr. Lee's burden under *Zerilli*.  The Court agrees with Judge Jackson, who noted:

> A plaintiff is not obligated to carry out a "wide-ranging and onerous discovery burden [] where the path is . . . ill-lighted." . . . [T]he *Zerilli* exhaustion-of-alternative-sources factor requires only that all "reasonable" sources of evidence be tapped.  *It does not require proof positive that the knowledge exists nowhere else on earth but in the minds of the journalists and their anonymous confidants*.

*Id.* at 14 (quoting *Carey*, 492 F.2d at 639, and *Zerilli*, 656 F.2d at 713) (emphasis added); *see also Lee*, 413 F.3d at 61.  Accordingly, Dr. Lee has sufficiently demonstrated that he has "exhausted every reasonable source of information."  *Zerilli*, 656 F.2d at 713.  Having met the standards of *Zerilli*, Dr. Lee has overcome Mr. Pincus's qualified reporter's privilege under the First Amendment.

### B.  A Federal Common Law Privilege

Mr. Pincus contends that his claim of privilege is also supported by a "line of cases that authorizes the recognition of privileges under Rule 501 of the Federal Rules of Evidence."

Pincus Response at 36. He urges the Court to formally recognize a reporter's privilege under federal common law. Although this argument was raised by the other journalists in *Lee*, the Court of Appeals limited its analysis to the First Amendment. *See* 413 F.3d at 57 n.2. And, while its decision in *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (D.C. Cir. 2005) ("*In re Miller*"), addressed a common law privilege for reporters, the Court of Appeals did not come to a consensus as to whether such a privilege exists or should be recognized. *See id.* at 973 ("The Court is not of one mind on the existence of a common law privilege. . . . However, all believe that if there is any such privilege, it is not absolute and may be overcome . . . .").[16] Accordingly, the question is squarely before this Court.

### 1. *Branzburg* and Federal Rule of Evidence 501

Dr. Lee contends that the Supreme Court's decision in *Branzburg* has already rejected the creation of a federal common law privilege to protect reporters from revealing their confidential sources. *See* Pl.'s Reply at 11-12; *see also In re Miller*, 397 F.3d at 977 (Sentelle, J., concurring) (concluding that the *Branzburg* Court "rejected a common law privilege in the same breath as its rejection of such privilege based on the First Amendment"). *Branzburg* expressly held that journalists do not enjoy a First Amendment privilege to refuse to disclose confidential sources to a grand jury except in extremely narrow circumstances. *See Branzburg*, 408 U.S. at 690;[17] *In re Miller*, 397 F.3d at 970 ("Unquestionably, the Supreme Court decided in *Branzburg* that there is no

---

[16] Judge Sentelle determined that a federal common law privilege protecting reporters should not be recognized, Judge Tatel concluded that such a privilege should be recognized, and Judge Henderson said that the issue did not need to be resolved on the facts of that particular case. *In re Miller*, 397 F.3d at 965.

[17] The Court excepted instances of grand jury investigations conducted other than in good faith. *Id*. at 707.

First Amendment privilege protecting journalists from appearing before a grand jury or from testifying before a grand jury or otherwise providing evidence to a grand jury regardless of any confidence promised by the reporter to any source. . . . [T]hat is the end of the matter.").  It is less clear that *Branzburg* definitively rejected a reporter's privilege at common law.  *See In re Miller*, 397 F.3d at 993 (Tatel, J., concurring) (describing the only issue before the Court as " 'whether requiring newsmen to appear and testify before state or federal grand juries abridges the freedom of speech and press *guaranteed by the First Amendment*' . . . not whether it abridged the common law") (quoting *Branzburg*, 408 U.S. at 667); *In re Miller*, 397 F.3d at 983 (Henderson, J., concurring) ("I cannot agree with Judge Sentelle's conclusion that the United States Supreme Court has answered the question we now avoid.")

> To date, the D.C. Circuit has limited the applicability of *Branzburg* to criminal proceedings.  *Zerilli*, 656 F.2d at 711 ("Although *Branzburg* may limit the scope of the reporter's First Amendment privilege in criminal proceedings, this circuit has previously held that in civil cases . . . that case is not controlling."); *see Zerilli*, 656 F.2d at 711  n.42 ("The Supreme Court's opinion in *Branzburg v. Hayes* . . . contains much language suggesting that its holding is confined to the grand jury or criminal trial context."); *see also Lee*, 413 F.3d at 58; *Carey*, 492 F.2d at 635-36.  For this reason, the Court concludes that *Branzburg* is not dispositive within the D.C. Circuit in the context of civil litigation.

> Congress has intentionally given the federal courts the authority to continue to develop and recognize new common law privileges.  *See* Fed. R. Evid. 501.  It is worth noting that Congress enacted Rule 501 in 1975, three years after the Supreme Court's decision in *Branzburg*.  Rule 501 authorizes federal courts to define new evidentiary privileges by interpreting "the principles

of the common law . . . in light of reason and experience." *Id*.  In *Jaffee v. Redmond*, 518 U.S. 1 (1996), the Supreme Court set forth the framework for considering whether consensus on a given privilege has become so shared, so common, that it can legitimately be recognized by the federal courts as part of the common law.  *Jaffee* recognized an evidentiary privilege in communications between psychotherapists (including licensed social workers) and their patients.  The Court noted the "significant public and private interests supporting recognition of the privilege," the "modest" evidentiary burden imposed, and the "uniform judgment" of all 50 States and the District of Columbia that had enacted legislation recognizing some variation of such a privilege. *Id.* at 12, 13.  But new privileges should be created sparingly and with caution.  *See United States v. Nixon*, 418 U.S. 683, 710 (1974) ("Exceptions to the demand for every man's evidence are not lightly created or expansively construed, for they are in derogation of the search for truth."); *Linde v. Resolution Trust Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (noting that "federal courts should not create evidentiary privileges lightly").  In order for a new privilege to be recognized, the privilege must "promote sufficiently important interests to outweigh the need for probative evidence." *Trammel v. United States*, 445 U.S. 40, 51 (1980).  Furthermore, the party seeking recognition of a new privilege must "demonstrate with a high degree of clarity and certainty that the proposed privilege will effectively advance a public good." *In re Sealed Case*, 148 F.3d 1073, 1076 (D.C. Cir. 1998).

## 2.  Analysis of a Reporter's Privilege at Common Law

Mr. Pincus argues that the drafters of Rule 501 explicitly contemplated the recognition of a reporter's privilege and that this Court has a duty to recognize the privilege.  *See Riley v. City of Chester*, 612 F.2d 708, 714 (3d Cir. 1979) (noting that "[t]he legislative history of Rule 501 manifests that its flexible language was designed to encompass . . . a reporter's privilege

not to disclose a source").   Although he initially argued for an absolute privilege, Mr. Pincus

concedes that the D.C. Circuit has already declared that any reporter's privilege at common law, if

it exists at all, would be qualified.   *See In re Miller*, 397 F.3d at 973 ("[I]f there is any such privilege,

it is not absolute and may be overcome by an appropriate showing.").

Mr. Pincus now argues that this Court should adopt the three-part test for analyzing

a reporter's privilege at common law that was proposed by Judge Tatel in *In re Miller*.  *See* 397 F.3d

at 1001 (Tatel, J., concurring).  *In re Miller* involved former *New York Times* reporter Judith Miller,

who spent 85 days in jail before agreeing to reveal her source(s) to a grand jury investigating the

alleged leak of a CIA agent's covert identity.   Although agreeing that Ms. Miller possessed no First

Amendment right to refuse to testify before a grand jury, Judge Tatel proposed recognizing a

qualified reporter's privilege under the common law, 397 F.3d at 989, 996, and urged the following

test:

> In leak cases, then, courts applying the privilege must consider not only the
> [1] government's need for the information and [2] exhaustion of alternative
> sources, but also the two competing public interests lying at the heart of the
> balancing test.  Specifically, the court must [3] weigh the public interest in
> compelling disclosure, measured by the harm the leak caused, against the
> public interest in newsgathering, measured by the leaked information's
> value.  That framework allows authorities seeking to punish a leak to access
> key evidence when the leaked information does more harm than good, such
> as in the nuclear weapon and military strike examples, while preventing
> discovery when no public interest supports it . . . .

*Id*. at 997-98.   The third prong of this test — that is, the "weigh[ing of] the public interest in

compelling disclosure . . . against the public interest in newsgathering" — finds its roots in the D.C.

Circuit's First Amendment cases in the civil context, which Judge Tatel read to require a "balanc[ing

of] 'the public interest in protecting the reporter's sources against the private interest in compelling

disclosure.' " *Id.* at 997 (quoting *Zerilli*, 656 F.2d at 712).  "[M]uch as our civil cases balance" these

interests, Judge Tatel wrote, "so must the reporter privilege account for the varying interests at stake

in different source relationships." *Id.*  Judge Tatel was, however, the only member of the *Miller*

panel to endorse such a balancing test.[18]

      *In re Miller*, of course, concerned a grand jury's investigation into possible criminal

conduct, and the Court reads the quoted language as applying specifically to that context — that is,

when the Government seeks access to a reporter's confidential sources to support a criminal

prosecution.[19]  Although Judge Tatel did not explicitly discuss the interests to be weighed in

evaluating a common law reporter's privilege in the civil context, the Court infers that he would

likewise "balance 'the public interest in protecting the reporter's sources against the private interest

in compelling disclosure.' " *See id.* at 997 (quoting *Zerilli*, 656 F.2d at 712).[20]  Although the reading

of *Zerilli* on which Judge Tatel based his reporter's privilege balancing test was disavowed in *Lee*,

which reaffirmed that *Zerilli* imposes a two-prong test without an interest-balancing requirement in

---

[18] *See also In re Grand Jury Subpoena, Judith Miller*, 405 F.3d 17, 18 (D.C. Cir. 2005) (Tatel, J., concurring in the denial of rehearing en banc) ("Judge Henderson's opinion — which, as the narrowest supporting the result, is the controlling decision of the court — determined neither whether any common law privilege exists nor what standard would govern its application if it did.") (citing *In re Miller*, 397 F.3d at 981-82 (Henderson, J., concurring)).

[19] *See also id.* at 999 (Tatel, J., concurring) ("The qualified privilege I would recognize . . . rests on Rule 501, not the Constitution.  If Congress believes that this approach overrides its judgment about what conduct should be criminal, it may simply overturn the privilege and authorized use of the evidence.")

[20] The different language is not without import.  Under a three-prong test for civil litigation, the private interests of the private civil plaintiff would be clearly in the balance.  This is a very different posture from requiring a private plaintiff to prove that a *public* interest in disclosure during the plaintiff's civil suit outweighs the *public* interest in protection for a newsman's sources.

First Amendment cases,[21] this does not necessarily mean that a similar balancing test might not define the contours of a common law privilege.

However, if the Court has interpreted Judge Tatel's decisions correctly, he proposes essentially the same test for evaluating a reporter's privilege under the common law as he proposes under the First Amendment. His concurrence in *In re Miller* seems to suggest a three-part test (need, exhaustion, and balancing of public and private interests) to evaluate a reporter's privilege at common law in civil cases. *See* 397 F.3d at 997 (Tatel, J., concurring). And his dissent from the denial of rehearing en banc in *Lee*, a First Amendment case, protested the panel's failure to " 'balance . . . [Lee's] interest in compelled disclosure [against] the public interest in protecting a newspaper's confidential sources.' " *Lee (Denial of Rehearing)*, 2005 WL 2874940, at *2 (Tatel, J., dissenting from the denial of rehearing en banc) (quoting *Zerilli*, 656 F.2d at 712) (alterations in original). Judge Garland joined in Judge Tatel's dissent and wrote his own dissenting opinion, in which Judge Tatel joined, urging adoption of the same three-part test for First Amendment cases in Privacy Act litigation. *Id.* at *2-3. Mr. Pincus argues that balancing of the relevant interests as part of the analysis "adds an important layer of protection because . . . 'a test focused on need and exhaustion will almost always be satisfied' eventually in a leak case, 'leaving the reporter's source unprotected regardless of the information's importance to the public.' " Pincus Opp. at 10 (quoting *In re Miller*, 397 F.3d at 997 (Tatel, J., concurring)).

There are several reasons that the Court finds this test inherently unworkable and ultimately rejects the creation of a federal common law reporter's privilege. To begin with, the law

---

[21] *See Lee*, 413 F.3d at 59; *Lee (Denial of Rehearing)*, 2005 WL 2874940, at *2 (Tatel, J., dissenting from the denial of rehearing en banc), *3 (Garland, J., dissenting from the denial of rehearing en banc).

of this Circuit is clear. *Zerilli* and *Lee* explicate a *two-part* test of centrality and exhaustion to overcome a reporter's privilege to conceal his sources under the First Amendment. Judges Tatel and Garland are of the minority opinion that a balancing test should be added in First Amendment cases arising under the Privacy Act,[22] to weigh the "newsworthiness" of the reporter's story on one scale and the private litigant's interest on the other. Judge Tatel would also recognize a reporter's privilege at common law and apply the same test, a view that was not accepted by Judges Sentelle or Henderson. *See In re Miller*, 397 F.3d at 973. This Court cannot reasonably import a three-part test from *Zerilli*, a First Amendment case, into a common law privilege as if consensus on the privilege and that test already existed when it so obviously does not. The reasoned disagreement among the learned judges on the D.C. Circuit cautions against recognizing a privilege that would have such indistinct contours. While that disagreement does not formally limit the Court in its analysis, it would circumvent the Court of Appeals' decisions in *In re Miller* and *Lee* to recognize the same test now under the common law.

---

[22]

> Normally, when a litigant seeks to discover the fruits of a journalist's work, a privilege analysis limited to need and exhaustion protects both the private interest in disclosure and the public interest in newsgathering. By utilizing the traditional tools of discovery to exhaust 'every reasonable alternative source of information,' the civil litigant seeking information that goes 'to the heart of the matter' can usually discover the same facts that the journalist unearthed.
>
> The situation is very different where the identity of a leaker is itself 'the heart of the matter" – as it is here; as it will be in any Privacy Act case . . . . A test focused only on need and exhaustion will therefore almost always be satisfied, leaving the reporter's source unprotected regardless of the information's importance to the public.

*Lee (Denial of Rehearing)*, 2005 WL 2874940, at *2 (Tatel, J., dissenting from the denial of rehearing en banc).

Submission of a reporter's privilege to a judge's determination of the newsworthiness of his or her story is also very troubling. Such a practice would create a subjective and elastic standard whose outcome could not be predicted. *Cf. Jaffee*, 518 U.S. at 17-18 ("Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege."). The determination of whether the harm caused by leaked information outweighs the "value" of that information to the citizenry would be a daunting and well-nigh impossible task. Courts are ill-suited to decide the degree to which information is beneficial or unimportant to the common weal. "[E]ach person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994). The potential for widely varying perspectives is demonstrated by this very case. Dr. Lee may be seen as advancing an entirely personal quest for monetary damages for leaks of information protected by the Privacy Act. Or, he may be seen as attempting to bring to light a serious abuse of power by senior federal officials who intentionally leaked information about the Lee investigation to create a smokescreen to cover up their own ineptitude. Whether a reporter must reveal his sources should not rest on the value assigned by a jurist to the reporter's story or the litigant's purpose.

The proliferation of communications media in the modern world makes it impossible to construct a reasonable or useful definition of who would be a "reporter" eligible to claim protection from a newly minted common law privilege. *See In re Miller*, 397 F.3d at 979 (Sentelle, J., concurring) (questioning whether the definition of "reporter" should include "the stereotypical 'blogger' sitting in his pajamas at his personal computer posting on the World Wide Web").

Reporters cannot be readily identified. They do not have special courses of study or special degrees. They are not licensed. They are not subject to any form of organized oversight or discipline. Thus, reporters as a group are very different from and much less distinct than the psychotherapists addressed in *Jaffee*. Without more definition for those entitled to invoke a reporter's privilege at common law, it can hardly be said that such a privilege would be certain or narrowly drawn. *See Upjohn*, 449 U.S. 383, 393 (1981) ("An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.").[23]

Mr. Pincus argues that a reporter's privilege, like the psychotherapist-patient privilege recognized in *Jaffee*, is "rooted in the imperative need for confidence and trust," unquestionably "serves public ends," and has been overwhelmingly embraced by the States and the District of Columbia. *See Jaffee*, 518 U.S. at 13 (noting that the Court had "recognized that it is appropriate to treat a consistent body of policy determinations by state legislatures as reflecting both 'reason' and 'experience.' "). The imperative for confidence and trust that was recognized in *Jaffee* exists "[b]ecause of the sensitive nature of the problems for which individuals consult psychotherapists

_____

[23] Perhaps the Court puts the horse behind the cart when it worries about the scope of a common law reporter's privilege as part of addressing its existence *vel non*. After all, the States appear to be in agreement that *some* "reporter's privilege" should exist, even though the nature and applicability of that privilege varies considerably from State to State. *See Jaffee*, 518 U.S. at 14 n.13 ("These variations in the scope of the protection [afforded by States to psychotherapists] are too limited to undermine the force of the States' unanimous judgment that some form of psychotherapist privilege is appropriate."). In one sense, the difficulty of determining coverage of any privilege should not matter since, under any definition, Mr. Pincus qualifies as a "reporter." But it is not possible to escape consideration of some outline to the reporter's privilege Mr. Pincus advances, if only for the purpose of considering whether reason and experience indicate that it should be recognized at all. It is true that any new privilege would not be tightly defined at the onset so that experience could inform its shape. Nonetheless, the fundamental questions of *whether* a privilege should be recognized and *who* would be covered are two sides of the same coin: the first cannot be answered without attention to the second.

[and because] disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace." *Id*. at 10.  Psychotherapy "is completely dependent upon [the patients'] willingness and ability to talk freely." *Id.* (internal quotation marks and citations omitted) (alteration in original).  A privilege that encourages and allows such frankness "serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem . . . [,] a public good of transcendent importance."  *Id.* at 11.

   The transcendent importance of a free press is that reporters can report the news and express opinions without fear of Government oppression or interference.  That is the true purpose and function of the language in the First Amendment mandating that "Congress shall make no law . . . abridging the freedom of speech, or of the press."  U.S. Const. amend. I.  The right to keep confidential an anonymous source is not "transcendent" in the same sense; this is clear because the privilege is qualified even under the stirring language of the Constitution.  Anonymous sources are not a *sine qua non* of journalism but only an important and useful tool.  *See Jaffee*, 518 U.S. at 10-11.  Thus, *Jaffee* is not analogous, and the Court is not persuaded that it should recognize the common law privilege for reporters that Mr. Pincus desires.

   When Mr. Pincus first argued for a common law privilege to protect a reporter's confidential sources, he explained to the Court that privileges at common law are absolute and would provide better protection than a qualified First Amendment privilege.  That distinction made pursuit of a common law privilege worthwhile.  In the meantime, however, the D.C. Circuit decided that if there were a common law privilege to protect reporters' sources, it would also be qualified.  *See In re Miller*, 397 F.3d at 973.  This Court perceives no added value to recognizing the qualified common law privilege now urged by Mr. Pincus because it would be indistinguishable from the First

Amendment privilege that Judges Tatel and Garland have articulated and that has not been adopted by the Circuit.

Mr. Pincus argues that this result undermines his function as a reporter because confidential sources for news stories about Dr. Lee and the investigation would not have spoken to him without an assurance of anonymity.  He argues that the violation of his commitments to his confidential sources will "destroy his ability to report effectively on intelligence and national security issues in the future."  Pincus Response at 10.  However, "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability."  *Branzburg*, 408 U.S. at 682; *see also Cohen v. Cowles,* 501 U.S. 663, 669 (1991) ("[G]enerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news").

Furthermore, the fact that this Court has refused to recognize the common law privilege articulated by Mr. Pincus does not leave reporters unprotected.  The *Zerilli* court struck a careful balance between providing a means for civil litigants to obtain crucial information and protecting journalists' confidences.  *See Lee*, 413 F.3d at 60 (noting that the fact that the First Amendment privilege is not absolute "does not leave journalists without protection"); *see also Branzburg*, 408 U.S. at 707 (noting that news reporters "are not without First Amendment protection").  Indeed, *Zerilli* stands for the proposition that "*in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege.*"  *Zerilli*, 656 F.2d at 712 (emphasis added).  Thus, it is clear that forcing a reporter to divulge his confidential sources is the exception, not the rule, and should only be done in extraordinary situations.

To accept Mr. Pincus's argument that he is protected by privilege from revealing whether Government officials illegally leaked information about Dr. Lee would undermine the fundamental purpose of the Privacy Act. Congress has provided a private right of action for individuals who are harmed by a Government agency's improper disclosure of confidential records. Accordingly, the law expressly discourages the kind of leaks that are at issue in this action. "[T]he protections of the Privacy Act do not disappear when the illegally disclosed information is leaked to a journalist, no matter how newsworthy the government official may feel the information is." *Lee*, 413 F.3d at 60.

Finding no basis in reason and experience to expand the law as requested, the Court declines to recognize such a privilege.[24]

## C. Mr. Pincus is in Contempt of Court

At his first deposition, Mr. Pincus continuously refused to answer any questions concerning the identity of his confidential sources that provided him with information concerning Dr. Lee and the Lee investigation. Accordingly, on June 29, 2004, Judge Jackson granted Dr. Lee's motion to compel further testimony from Mr. Pincus, rejecting his assertions of privilege. Despite this Order, Mr. Pincus again attempted to invoke a "reporter's privilege" at his second deposition, refusing to answer any questions concerning the identity of his confidential sources. The Court concludes that because Mr. Pincus is not protected by a "reporter's privilege" under the First

---

[24] At oral argument, Mr. Pincus argued that Dr. Lee cannot ultimately prevail on the merits of his Privacy Act case and that Mr. Pincus should not be compelled to reveal his confidential sources to support a case that has no merit. This argument must be rejected. Mr. Pincus is a non-party and this case is in discovery. Not only does Mr. Pincus lack standing to raise arguments concerning the merits of Dr. Lee's lawsuit, but at this early stage in the litigation, the resolution of such issues is wholly premature.

Amendment or pursuant to federal common law, his refusal to answer such questions at his second deposition places him in contempt of the June 29, 2004, Order.

A person is in contempt of court when he "violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order." *Bankers Alliance Corp.*, 881 F. Supp. at 678. In order for the Court to hold Mr. Pincus in contempt, Dr. Lee must demonstrate that (1) the Court's June 29, 2004, Order was reasonably clear and specific and (2) Mr. Pincus failed to comply with the Order. *Id*. This standard has clearly been met.

First, there is no doubt that the Court's June 29, 2004, Order was clear and specific. After Mr. Pincus refused to disclose his confidential sources at his first deposition, the parties fully briefed the issues relating to whether Mr. Pincus should be compelled to answer the same kinds of questions that the other journalists were compelled to answer by way of the Court's October 9, 2003 Discovery Order. Judge Jackson's June 29, 2004, Order expressly stated that Dr. Lee's motion to compel further testimony from Mr. Pincus would be granted "[u]pon consideration of the entire record, and essentially for the reasons stated in the Court's October 9, 2003, Memorandum & Order." Given the procedural history of this side-litigation and Mr. Pincus's substantial familiarity with the Court's Discovery Order, the June 29, 2004, Order can hardly be deemed ambiguous.

Mr. Pincus challenges the validity of the June 29, 2004, Order on the ground that the order made no "specific findings" as to him. Pincus Response at 15 (citation omitted). He argues that Judge Jackson's statement that Dr. Lee's motion to compel is granted "essentially for the reasons stated" in the Discovery Order, which was only applicable to the other journalists, is "not sufficient to support an order compelling the identification of Mr. Pincus's sources, much less an order holding

30

him in contempt." *Id*.   However, in granting Dr. Lee's motion to compel, it is unmistakably clear

that Judge Jackson concluded that Mr. Pincus was similarly situated to the other journalists.[25]   Judge

Jackson determined that the other journalists were required to reveal their confidential sources

because Dr. Lee had made an appropriate showing of centrality and exhaustion, pursuant to *Zerilli*,

to overcome their qualified First Amendment privilege.   *See* Discovery Order, 287 F. Supp. 2d at 24.

Accordingly, his June 29, 2004, Order compelling further testimony from Mr. Pincus "essentially

for the reasons stated" was based upon his analysis in the Discovery Order that Dr. Lee had met the

*Zerilli* requirements and therefore *none* of the journalists from whom Dr. Lee was seeking relevant

testimony was protected by a reporter's privilege.   *See* Contempt Order, 327 F. Supp. 2d at 28 n.1.

Furthermore, it is disingenuous for Mr. Pincus to try now to distance himself from

the other journalists and argue that his situation is markedly different.   Again, the only reason that

Mr. Pincus was not technically subject to Judge Jackson's Discovery Order in the first place was

because of a procedural anomaly.   *See supra* n.9.   In any event, after refusing to answer questions

concerning the identities of his confidential sources at his first deposition, it is crystal clear that Mr.

Pincus understood that the purpose of the Court's June 29, 2004, Order was to compel him to reveal

those sources (to the extent that they were agents or officers of the Government defendants and

provided him with information concerning Dr. Lee or the investigation) at a second deposition:

> I understand that [the Court] has entered an order compelling further
> testimony from me in response to questions that seek the identity of
> confidential sources from my reporting on Wen Ho Lee. . . . It's my
> intention today respectfully to decline to identify my confidential sources
> so that I may preserve my ability to seek appellate review of the order that
> compels me to do so.

---

[25] The discussion herein emphasizes that very point.

Pl.'s App. at Exh. 24, p. 8, ll.13-25 (Depo. Tr. of W. Pincus).  In light of this statement, and the other factors discussed above, it is difficult to follow, and even more difficult to accept, Mr. Pincus's argument that the Court's June 29, 2004, Order was not clear and specific.

Finally, the second prong of the contempt standard, which requires Dr. Lee to proffer clear and convincing evidence that Mr. Pincus violated the Court's June 29, 2004, Order, is easily satisfied.  At his second deposition, which was scheduled subsequent to the Court's June 29, 2004, Order, Mr. Pincus stated that although he was aware of the Court's order requiring that he answer questions concerning the identity of his confidential sources, he would decline to do so. *See id.*  He kept his promise, and when asked questions concerning the identity of Government sources who provided him with information about Dr. Lee and the investigation, he continued to assert a "reporter's privilege." *See* Pl.'s App. at 21-22.  Mr. Pincus's refusal to answer these questions was a clear violation of "a definite and specific court order requiring him to perform . . . a particular act." *Bankers Alliance Corp.*, 881 F. Supp. at 678.

## IV.  CONCLUSION

On June 29, 2004, this Court issued an Order compelling Mr. Pincus to provide further deposition testimony to Dr. Lee concerning the identity of Government sources who directly provided him with information concerning Dr. Lee and the Lee investigation.  Dr. Lee has demonstrated by clear and convincing evidence that Mr. Pincus violated the Court's order that he identify his sources.  For the reasons stated above, the Court finds that the qualified First Amendment reporter's privilege does not protect Mr. Pincus from revealing his sources and that the reporter's privilege urged by Mr. Pincus in federal common law is not tenable.  Accordingly, Mr. Pincus will be held in civil contempt and a fine of $500 per day will be levied until he complies.

In order to avoid a repetition of the Judith Miller imbroglio, the Court will also order Mr. Pincus to contact each and every one of his Government sources to inform them of the Court's order so that, should they release him from his pledge of confidentiality, Mr. Pincus can reconsider whether he needs to further resist the order of the Court and, perhaps, this matter can become moot without further litigation.  Mr. Pincus will be required to file a sworn statement with the Court within 48 hours attesting to his fulfillment of this part of the Court's order and informing the Court whether he is ready to answer questions identifying his sources.

The fine will be stayed for thirty (30) days or until completion of proceedings on a timely appeal to the Court of Appeals for the District of Columbia Circuit, whichever is later. Plaintiff's application for a compensatory award of sanctions will be denied without prejudice.  A separate Order accompanies this memorandum opinion.


Date: November 16, 2005                    _____/s/_____
                                           ROSEMARY M. COLLYER
                                           United States District Judge